VAUGHN SCOTT MILLER, Plaintiff v. ELIZABETH SZILAGYI, SZ*B CORPORATION, MICHAEL McNAMARA, JAMES H. THOMPSON and MARY M. THOMPSON, Defendants

No. COA11-1458

(Filed 5 June 2012)

**1. Appeal and Error—interlocutory orders and appeals— adverse ruling as to jurisdiction—immediately appealable**

Plaintiff's appeal from the trial court's interlocutory order dismissing some, but not all, defendants for lack of personal jurisdiction was proper pursuant to N.C.G.S. § 1-277(b), which provides that any interested party shall have the right of immediate appeal from an adverse ruling as to the jurisdiction of the court over the person or property of the defendant.

**2. Jurisdiction—personal—insufficient minimum contacts— contract—communications**

The trial court did not err by granting defendants' motion to dismiss plaintiff's cause of action for a lack of personal jurisdiction. A contract between plaintiff and defendants was insufficient on its own to establish minimum contacts, as were defendants' numerous telephone calls, emails, and other communications to plaintiff in North Carolina.

Appeal by plaintiff from order entered 15 September 2011 by Judge John O. Craig, III, in Surry County Superior Court. Heard in the Court of Appeals 21 March 2012.

MILLER v. SZILAGYI

[221 N.C. App. 79 (2012)]

*Robinson, Bradshaw & Hinson, P.A., by R. Steven DeGeorge, for the plaintiff.*

*John J. Korzen for the defendants.*

THIGPEN, Judge.

Vaughn Scott Miller ("Plaintiff") appeals from an order of the trial court granting James and Mary Thompson's ("the Thompsons") N.C. Gen. Stat. § 1A-1, Rule 12(b)(2) motion to dismiss Plaintiff's cause of action against the Thompsons due to a lack of personal jurisdiction. On appeal, Plaintiff contends there are sufficient minimum contacts between the Thompsons and North Carolina to establish specific jurisdiction.[1] We affirm the order of the trial court.

The record tends to show the following: On 19 July 2006, Plaintiff —who, at the time of the filing of the complaint in this case, was a resident of Surry County, North Carolina[2]—and Richard Hadden, who is not a party to this lawsuit, entered into an agreement ("First Agreement") with the Thompsons to purchase Healthmark Corporation, Inc., Healthmark of Walton, Inc., and Healthmark of Walton Rural Health Clinic, Inc., (collectively, "Healthmark"), as well as the partnership assets of JTMT, LLP, the Hospital Annex Building, and a quantity of land owned by the Thompsons.[3] Plaintiff wrote a $360,000.00 check to be deposited into a trust account retained by the Thompsons' attorney. Of the $360,000.00, $50,000.00 was deemed nonrefundable, and $310,000.00 was to be refunded to Plaintiff upon certain circumstances.

The parties did not close on the First Agreement. Instead, on 7 February 2007, the Thompsons informed Plaintiff that the First Agreement had expired. The Thompsons retained the entire $360,000.00 deposit.

On 7 April 2008, the Thompsons entered into an agreement ("Second Agreement") with Doctors Hospital of Defuniak Springs, Inc. ("Doctors Hospital"), pursuant to which the Thompsons agreed to sell, and Doctors Hospital agreed to purchase, the capital stock of

---

1. Other causes of action remain pending against three Defendants in this action, Elizabeth Szilagyi, SZ*B Corporation, and Michael McNamara (collectively, with the Thompsons, "Defendants").

2. Plaintiff subsequently moved to Kentucky

3. Healthmark consists of companies incorporated under the law of Florida, headquartered and operating in Florida, and only doing business in Florida.

Healthmark. Plaintiff was the vice president and director of Doctors Hospital, which was a North Carolina corporation with its principal place of business in Surry County, North Carolina.

On 14 April 2008, Mr. Thompson sent Plaintiff an unsigned agreement ("Third Agreement") for Doctors Hospital's purchase of the capital stock of Healthmark. Plaintiff signed the agreement in his capacity as vice president and director of Doctors Hospital and had it notarized in Surry County, North Carolina. The Thompsons signed the agreement on 15 April 2008.

On 28 March 2011, Plaintiff filed a complaint against Defendants, which contained no allegations pertaining to personal jurisdiction, to recover the refundable $310,000.00 portion of the deposit from the First Agreement.

On 27 April 2011, the Thompsons filed a N.C. Gen. Stat. § 1A-1, Rule 12(b)(2) motion to dismiss the complaint for a lack of personal jurisdiction on the grounds that the Thompsons did not have sufficient minimum contacts with North Carolina. The Thompsons stated in their motion that they "have had no contacts with North Carolina and have not purposefully availed themselves of the privilege of conducting activities within North Carolina." The Thompsons also submitted a brief in support of their motion to dismiss, which included three affidavits. Plaintiff filed a brief in opposition to the motion to dismiss, which also included three affidavits.

On 15 September 2011, the trial court entered an order granting the Thompson's N.C. Gen. Stat. § 1A-1, Rule 12(b)(2) motion to dismiss Plaintiff's cause of action against the Thompsons. The trial court concluded:

> Subjecting the Thompsons to the jurisdiction of North Carolina would violate the due process clause of the United States Constitution because the Thompsons did not have sufficient minimum contacts with North Carolina[,] and thus the exercise of jurisdiction would not comport with traditional notions of fair play and substantial justice.

From this order, Plaintiff appeals.

## I: Interlocutory Order

**[1]** Preliminarily, we note that the order from which Plaintiff appeals is an interlocutory order, because it dismisses Plaintiff's cause of action against the Thompsons, but not Plaintiff's causes of action

against the remaining defendants—Elizabeth Szilagyi, SZ*B Corporation, and Michael McNamara. Plaintiff's claims against Elizabeth Szilagyi, SZ*B Corporation, and Michael McNamara are still pending. *See Flitt v. Flitt*, 149 N.C. App. 475, 477, 561 S.E.2d 511, 513 (2002) ("An order is interlocutory if it is made during the pendency of an action and does not dispose of the case but requires further action by the trial court in order to finally determine the rights of *all the parties* involved in the controversy") (emphasis added). "Generally, there is no right to appeal from an interlocutory order." *Id.* However, Plaintiff's appeal in this case is proper pursuant to N.C. Gen. Stat. § 1-277(b) (2011), which provides that "[a]ny interested party shall have the right of immediate appeal from an adverse ruling as to the jurisdiction of the court over the person or property of the defendant[.]" *See also Dailey v. Popma*, 191 N.C. App. 64, 68, 662 S.E.2d 12, 15 (2008) (holding, "[s]ince plaintiff's claim was dismissed as a result of the trial court's decision that it lacked personal jurisdiction over defendant, plaintiff has a right to an immediate appeal of that order"). We now address the merits of Plaintiff's appeal.

## II: Personal Jurisdiction

**[2]** On appeal, Plaintiff contends that the trial court erred in concluding the Thompsons did not have sufficient "minimum contacts" with North Carolina to support the exercise of personal jurisdiction over them. Plaintiff further contends the trial court erred in concluding that Plaintiff failed to meet his burden of proof with regard to personal jurisdiction. We disagree with both contentions.

"The standard of review of an order determining personal jurisdiction is whether the findings of fact by the trial court are supported by competent evidence in the record[.]" *Bell v. Mozley*, ___ N.C. App. ___, ___, 716 S.E.2d 868, 871 (2011) (quotation omitted). "Where no exception is taken to a finding of fact by the trial court, the finding is presumed to be supported by competent evidence and is binding on appeal." *Id.* (quotations omitted). "We review *de novo* the issue of whether the trial court's findings of fact support its conclusion of law that the court has personal jurisdiction over defendant." *Id.* (citation omitted).

"Our courts engage in a two-step inquiry to resolve whether personal jurisdiction over a non-resident defendant is properly asserted: first, North Carolina's long-arm statute must authorize jurisdiction over the defendant. If so, the court must then determine whether the exercise of jurisdiction is consistent with due process." *Bauer v.*

*Douglas Aquatics, Inc.*, ____ N.C. App. ____, ____, 698 S.E.2d 757, 760 (2010) (citation omitted).

Plaintiff asserts and Defendants do not dispute that pursuant to N.C. Gen. Stat. § 1-75.4(5)(d), a component of the North Carolina long-arm statute, the Thompsons are subject to personal jurisdiction because there exists an action related to "goods, documents of title, or other things of value shipped from this State by the plaintiff to the defendant on his order or direction[.]" Defendant states that the Thompsons directed Plaintiff to send the $360,000.00 check, drawn on Plaintiff's North Carolina bank account, to the Thompsons' attorney in Florida. Defendant also cites *Lab. Corp. of Am. Holdings v. Caccuro*, ____ N.C. App. ____, 712 S.E.2d 696 (2011), for the proposition that the check constituted a "thing of value" for purposes of N.C. Gen. Stat. § 1-75.4(5)(d). *See id.* at ____, 712 S.E.2d at 700 (holding that "all that is required to satisfy N.C. Gen. Stat. § 1-75.4(5)(d) is that a defendant demanded money from the plaintiff and the plaintiff paid the money from North Carolina"). We agree with Plaintiff's assertion that North Carolina's long-arm statute authorizes personal jurisdiction over the Thompsons. Therefore, we must now determine whether the exercise of jurisdiction over the Thompsons is consistent with due process.

"The Due Process Clause of the Fourteenth Amendment operates to limit the power of a state to assert *in personam* jurisdiction over a non-resident defendant." *Hiwassee Stables, Inc. v. Cunningham*, 135 N.C. App. 24, 28, 519 S.E.2d 317, 320 (1999) (citations omitted). "In order for personal jurisdiction to exist, a sufficient connection between defendant and the forum state must be present so as to make it fair to require defense of the action in the forum state." *Id.* (citations omitted). "The pivotal inquiry is whether the defendant has established certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Id.* (quotations omitted).

"There are two types of personal jurisdiction. General jurisdiction exists when the defendant's contacts with the state are not related to the cause of action but the defendant's activities in the forum are sufficiently continuous and systematic. Specific jurisdiction exists when the cause of action arises from or is related to defendant's contacts with the forum." *Skinner v. Preferred Credit*, 361 N.C. 114, 122, 638 S.E.2d 203, 210 (2006) (quotation omitted). Plaintiff in this case only argues that specific jurisdiction exists. "[F]or the pur-

poses of asserting specific jurisdiction, [o]ur focus should . . . be upon the relationship among the defendant, this State, and the cause of action." *Id.* at 123, 638 S.E.2d at 210 (quotation omitted).

> The factors used in determining the existence of minimum contacts include (1) quantity of the contacts, (2) nature and quality of the contacts, (3) the source and connection of the cause of action to the contacts, (4) the interest of the forum state, and (5) convenience to the parties. To effectuate minimum contacts, a defendant must have acted to purposefully avail itself of the privileges of conducting activities within this state, thus invoking the benefits and protection of our laws. Additionally, the relationship between defendant and North Carolina must be such that defendant should reasonably anticipate being haled into court in this state. In considering the foreseeability of litigation, the interests of, and fairness to, both the plaintiff and the defendant must be considered and weighed. As the United States Supreme Court has explained, the
>
> > "purposeful availment" requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of "random," "fortuitous," or "attenuated" contacts, or of the "unilateral activity of another party or a third person . . . . Jurisdiction is proper, however, where the contacts proximately result from actions by the defendant *himself* that create a "substantial connection" with the forum State.

*Hiwassee Stables*, 135 N.C. App. at 28-29, 519 S.E.2d at 320-21 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475, 85 L. Ed. 2d 528, 542, 105 S. Ct. 2174, \_\_\_\_ (1985)) (internal citations and quotations omitted) (emphasis in original).

"A plaintiff bears the burden of establishing that some ground exists for the exercise of personal jurisdiction over a defendant." *Jaeger v. Applied Analytical Indus. Deutschland GMBH*, 159 N.C. App. 167, 170, 582 S.E.2d 640, 643-44 (2003). "The trial court may conduct an evidentiary hearing including testimony or depositions, but the plaintiff maintains the ultimate burden of proving personal jurisdiction by a preponderance of the evidence at the evidentiary hearing or at trial." *Id.* at 170, 582 S.E.2d at 644. Moreover, "[w]hen the parties submit 'dueling affidavits' under the third category, the trial court may decide the matter from review of the affidavits, or the court may direct that the matter be heard wholly or partly on oral testimony or depositions." *Bauer v. Douglas Aquatics, Inc.*, \_\_\_\_ N.C. App. \_\_\_\_, \_\_\_\_, 698 S.E.2d 757, 761 (2010) (quotation omitted). "In either case,

the plaintiff bears the burden of proving, by a preponderance of the evidence, grounds for exercising personal jurisdiction over a defendant." *Id.* (citation omitted).

In this case, Plaintiff does not challenge the sufficiency of the evidence to support the trial court's findings. Rather, Plaintiff contends that the facts of this case require a different legal conclusion, that specific jurisdiction existed as to the Thompsons. Therefore, we must determine whether the trial court's unchallenged findings of fact, which are presumed to be supported by competent evidence, support the trial court's conclusion of law that "[s]ubjecting the Thompsons to the jurisdiction of North Carolina would violate the due process clause[.]"

The trial court made the following pertinent findings of fact in its order dismissing Plaintiff's complaint against the Thompsons:

6. Healthmark consists of companies incorporated under the law of Florida, headquartered and operating in Florida, owned by a Florida resident, and not doing business in North Carolina.

7. Other than the purchase of certain hospital equipment in 2005, neither Healthmark nor JTMT, LLP[,] conducted business in, advertised in, solicited for business in, or shipped goods into North Carolina.

8. Miller contacted Mr. Thompson while Mr. Thompson was in Florida, about buying Healthmark, the partnership assets of JTMT, LLP, the Hospital Annex Building and the land.

9. Miller's Complaint does not allege that the Thompsons reached into North Carolina and solicited him as a buyer; instead, "Miller learned that the Thompsons were interested in selling certain businesses."

10. Aside from the possible refund of $310,000 of the Deposit to Miller in North Carolina or Kentucky, the Thompsons were to perform the First Agreement entirely in Florida.

11. Neither James nor Mary Thompson had ever physically been to North Carolina to discuss any of the matters alleged in the Complaint.

12. The attorney for the Thompsons who received the Deposit is located in Florida and is licensed in Florida.

13. The First Agreement was signed and notarized in Florida.

14. On April 7, 2008, almost two years after the First Agreement was signed, and over one year after the Thompsons notified Miller that the First Agreement had expired, a Second Agreement was made between the Thompsons and a North Carolina corporation, Doctors Hospital of DeFuniak Springs, Inc. ("Doctors Hospital"), which is not a party to this lawsuit. Miller was a Vice President and director of Doctors Hospital. The Second Agreement involved the sale of the same entities and land as in the First Agreement. Miller signed the Second Agreement as Vice President of Doctors Hospital.

15. On or about April 15, 2008, a Third Agreement was signed between the Thompsons and Doctors Hospital, again involving the sale of the same entities and land as in the First Agreement and Second Agreement. Miller signed the Third Agreement and had it notarized in Surry County, North Carolina.

16. The Thompsons and other representatives of Healthmark directed email, fax and telephone communications to Miller in North Carolina in both 2006 and 2008 as set forth in the two Affidavits submitted by Miller in opposition to the Thompsons' Motion to Dismiss. The first Affidavit submitted by Mr. Miller is very specific about the dates of emails, faxes and telephone communications to him and contains supporting exhibits. Paragraphs 9-21 of the first Affidavit refer to agreements, faxes, emails and phone calls which took place in 2008. Similarly, exhibits 5-19 to the first Miller Affidavit are agreements, faxes, emails and references to telephone calls which took place in 2008. Paragraph 3 of the Second Affidavit of Mr. Miller references "approximately 25 emails and faxes" and "approximately 40 telephone calls" but does not indicate when the emails and faxes were sent or when the telephone calls were placed nor does this Second Affidavit contain copies of any of the emails or faxes.

Based on the foregoing findings of fact, the trial court made the following conclusions of law:

7. Miller and the Thompsons agree that this Court does not have general jurisdiction over the Thompsons. In fact, Miller's counsel stated in open Court that it was his contention that if this Court has jurisdiction over the Thompsons, it is specific jurisdiction.

8. Specific jurisdiction exists if the defendants have purposely directed their activities toward a resident of the forum and the

cause of action relates to those activities. This inquiry focuses on whether the defendants purposefully availed themselves of the privilege of conducting activities in [this] state, thereby invoking the benefits and protections of the forum state's law. See Wyatt v. Walt Disney World, Co., 151 N.C. App. 158, 165, 565 S.E.2d 705, 710 (2002).

. . .

11. The Thompsons did not purposely direct their activities toward a resident of this state because they did not personally avail themselves of the privilege of conducting activities in North Carolina, and thus they did not invoke the benefits and protections of North Carolina's laws.

12. Because the Thompsons live and work in Florida and the First Agreement was to be performed in Florida, it would create a burden on the Thompsons to appear in North Carolina to defend this action.

13. Miller has attempted to conflate the activities surrounding the First Agreement signed on July 17, 2006 with the Second and Third Agreements signed On April 7, 2008 and April 15, 2008, respectively. Because the Second and Third Agreements were signed almost two years after the First Agreement, and because Miller was not personally a party to the Second or Third Agreements, the Court concludes that activities surrounding the Second and Third Agreements are irrelevant for purposes of determining whether the Thompsons had sufficient minimum contacts with North Carolina such that this Court could exercise specific jurisdiction over them.

14. Subjecting the Thompsons to the jurisdiction of North Carolina would violate the due process clause of the United States Constitution because the Thompsons did not have sufficient minimum contacts with North Carolina and thus the exercise of jurisdiction would not comport with traditional notions of fair play and substantial justice.

15. Miller has failed to meet his burden of establishing that this Court has jurisdiction over the Thompsons.

Plaintiff contends, contrary to the trial court's conclusion, that the facts of this case are sufficient to establish minimum contacts such that the court had specific jurisdiction over the Thompsons. Plaintiff

specifically contends (1) the contracts between Plaintiff, Doctors Hospital, and the Thompsons are sufficient to establish minimum contacts, and (2) the Thompsons' numerous telephone calls, emails, and other communications to Plaintiff in North Carolina were sufficient to establish minimum contacts. We disagree with both contentions and address each in turn.

First, Plaintiff emphasizes that the Thompsons entered into three contracts with either Plaintiff, a North Carolina resident, or Doctors Hospital, a North Carolina corporation. Plaintiff argues that *Tom Togs, Inc. v. Ben Elias Industries Corp.*, 318 N.C. 361, 348 S.E.2d 782 (1986), stands for the proposition that the contracts alone are a sufficient basis for personal jurisdiction. We find this argument unconvincing.

As an initial matter, we believe the trial court was correct in concluding that the Second Agreement and the Third Agreement are "irrelevant for purposes of determining whether the Thompsons had sufficient minimum contacts with North Carolina such that this Court could exercise specific jurisdiction over them." "[F]or the purposes of asserting specific jurisdiction, [o]ur focus should . . . be upon the relationship among the defendant, this State, and the cause of action." *Skinner*, 361 N.C. at 123, 638 S.E.2d at 210. The cause of action against the Thompsons in this case is for the recovery of the refundable $310,000.00 portion of the deposit pursuant to the First Agreement. The Second Agreement and the Third Agreement between the Thompsons and Doctors Hospital are not mentioned in Plaintiff's complaint. Morever, Doctors Hospital was not a party to the First Agreement or this action. We conclude the trial court did not err by concluding that the Second and Third Agreements are outside the scope of "the relationship among the defendant, this State, and the cause of action." *Id.*

We must now determine whether the First Agreement was sufficient to establish minimum contacts.

> In determining whether a single contract may serve as a sufficient basis for the exercise of *in personam* jurisdiction, it is essential that there be some act by which defendant purposefully availed itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protection of its laws. . . . For only then will the non-resident have acted in such a way such that he can reasonably anticipate being haled into court there. . . . Otherwise, exercise of *in personam* jurisdiction over a

nonresident would violate standards of fair-play and substantial justice.

*Charter Med., Ltd. v. Zigmed, Inc.*, 173 N.C. App. 213, 216, 617 S.E.2d 352, 355, *appeal dismissed*, 360 N.C. 61, 623 S.E.2d 580 (2005) (quotation omitted). "[T]he mere act of entering a contract with a forum resident does not provide the necessary contacts when all elements of the defendant's performance are to occur outside the forum." *Id.* at 217, 617 S.E.2d at 355 (quotation omitted). "[I]n cases of contract disputes, the touchstone in ascertaining the strength of the connection between the cause of action and the defendant's contacts is whether the cause of action arises out of attempts by the defendant to benefit from the laws of the forum state by entering the market in the forum state." *Id.* at 217, 617 S.E.2d at 356 (quotation omitted).

*Tom Togs* states that "[a]lthough a contractual relationship between a North Carolina resident and an out-of-state party alone does not *automatically* establish the necessary minimum contacts with this State, nevertheless, a single contract may be a sufficient basis for the exercise of *in personam* jurisdiction if it has a substantial connection with this State." *Tom Togs*, 318 N.C. at 367, 348 S.E.2d 782 at 786. (emphasis in original). The Court in *Tom Togs* explained:

> [T]he defendant made an offer to plaintiff whom defendant knew to be located in North Carolina. Plaintiff accepted the offer in North Carolina. The contract was therefore made in North Carolina, as we discussed earlier. The contract was for specially manufactured goods, shirts in this case, for which plaintiff was to be paid over $44,000. Defendant was told that the shirts would be cut in North Carolina, and defendant also agreed to send its personal labels to plaintiff in North Carolina for plaintiff to attach to the shirts. Defendant was thus aware that the contract was going to be substantially performed in this State. The shirts were in fact manufactured in and shipped from this State. After defendant contacted the plaintiff to complain about the shirts, defendant then returned them to this State. We therefore conclude that the contract between defendant and plaintiff had a "substantial connection" with this State.

*Id.* at 367, 348 S.E.2d at 786-87.

In *Tom Togs*, the facts establishing a substantial connection between the defendant and the State of North Carolina contrast starkly with the facts of the present case. Here, the record shows that Plaintiff, not the Thompsons, initiated the offer by contacting the

Thompsons in Florida. According to the complaint, Plaintiff "learned" that the Thompsons were interested in selling certain businesses, and Plaintiff "became interested in the possibility of purchasing Healthmark." Plaintiff's purchase from the Thompsons—primarily, the purchase of Healthmark—consisted of companies incorporated under the law of Florida, headquartered and operating in Florida, and not doing business in North Carolina. The purchase agreement was signed and notarized in Florida. With one exception—the purchase of certain hospital equipment in 2005—neither Healthmark nor JTMT, LLP, conducted business in, advertised in, solicited for business in, or shipped goods into North Carolina. With the exception of the possible refund of $310,000 of the deposit to Plaintiff in North Carolina or Kentucky, the Thompsons were to perform the First Agreement entirely in Florida. Moreover, the Thompsons had never physically been to North Carolina to discuss any of the matters alleged in the complaint. Based on the foregoing, we neither believe that the Thompsons purposefully availed themselves of the privilege of conducting activities within North Carolina, *Charter Med., Ltd.*, 173 N.C. App. at 216, 617 S.E.2d at 355, nor that the Thompsons attempted to benefit from the laws of North Carolina by entering the market in this State, *Id.* at 217, 617 S.E.2d at 356. Therefore, we conclude the trial court's findings of fact with regard to the First Agreement between Plaintiff and the Thompsons supported the trial court's conclusion that the First Agreement was insufficient to establish specific jurisdiction. *See CFA Medical, Inc. v. Burkhalter*, 95 N.C. App. 391, 396, 383 S.E.2d 214, 217 (1989) (holding, "[w]here the record is clear that the contract was entered into outside North Carolina, where there is no provision in the contract requiring the defendant to perform services within North Carolina, where the defendant has performed all services under the contract outside North Carolina, where for the life of the contract the defendant has not been in the state for any purpose and, most importantly, where the defendant has not originated contact with any North Carolina market or industry, minimum contacts cannot be found[;] [t]he act of entering a contract with a forum resident does not provide the necessary contacts when the defendant's performance is to occur exclusively outside the forum[;] [f]urthermore, the mere mailing of a payment from outside the state is not sufficient to sustain *in personam* jurisdiction in the forum state") (internal citations omitted).

We next address Plaintiff's contention that the Thompsons' numerous telephone calls, emails, and other communications to Plaintiff in North Carolina were sufficient to establish minimum con-

MILLER v. SZILAGYI

[221 N.C. App. 79 (2012)]

tacts. Plaintiff argues that *Brown v. Ellis*, 363 N.C. 360, 678 S.E.2d 222 (2009), stands for the proposition that "telephone calls and emails to North Carolina [are] sufficient for personal jurisdiction." We are not persuaded by this argument.

In *Brown*, the North Carolina Supreme Court concluded that the "plaintiff alleged sufficient facts in his complaint to support the trial court's determination that personal jurisdiction over [the] defendant exists under North Carolina's long-arm statute."[4] *Id.* at 361, 678 S.E.2d at 222. The plaintiff in *Brown* alleged causes of action against the defendant for alienation of affection and criminal conversation. *Id.* at 361, 678 S.E.2d at 222. The plaintiff further alleged that he resided in Guilford County, North Carolina, with his wife and daughter, and that defendant resided in Orange County, California. The plaintiff in *Brown* also alleged the following:

> [The] plaintiff's wife and defendant were both employed by the same parent company and worked together on numerous occasions. Plaintiff alleged defendant willfully alienated the affections of plaintiff's wife by, among other actions, "initiating frequent and inappropriate, and unnecessary telephone and e-mail conversations with [plaintiff's wife] on an almost daily basis." The telephone conversations between defendant and plaintiff's wife "often occurred in the presence of plaintiff and his minor child" and "involved discussions of defendant's sexual and romantic relationship with plaintiff's spouse." Plaintiff alleged that "through numerous telephone calls and e-mails to plaintiff's spouse, [defendant] has arranged to meet, and has met with plaintiff's spouse on numerous occasions outside the State of North Carolina, under the pretense of business-related travel." The complaint further alleged that plaintiff's wife and defendant committed adultery during these business trips, which further alienated and destroyed the marital relationship between plaintiff and his wife. In support of his complaint, plaintiff submitted an affidavit alleging that "the majority of defendant's conduct which constitutes an alienation of affections occurred within the jurisdiction of North Carolina" and that "[e]vidence as to the frequent electronic and telephonic contact between defendant and plaintiff's

---

4. On remand from our Supreme Court, this Court further concluded that the "plaintiff has alleged sufficient facts to satisfy minimum contacts[,]" and the "defendant's rights to due process in regard to personal jurisdiction have not been violated." *Brown v. Ellis*, __ N.C. App. __, __, 696 S.E.2d 813, 819 (2010), *disc. review denied*, 365 N.C. 209, 709 S.E.2d 928 (2011).

spouse can be established through records and witnesses located in the State of North Carolina."

*Id.* at 361-62, 678 S.E.2d at 222-23. Our Supreme Court concluded the plaintiff's complaint alleged sufficient facts to authorize the exercise of personal jurisdiction over the defendant pursuant to N.C. Gen. Stat. § 1-75.4(4)(a). *Id.* at 364, 678 S.E.2d at 224.

In this case, Defendant cites *Brown* for the proposition that "[p]ersonal jurisdiction may be based on placing telephone calls, and sending emails to a North Carolina resident." This, we believe, is not the holding of *Brown*. The Court in *Brown* emphasized that the phone calls and emails from the defendant to the plaintiff's wife in North Carolina were "almost daily[.]" By means of the phone calls and emails, the defendant was able to arrange meetings with the plaintiff's wife, including meetings out-of-state "under the pretense of business-related travel." *Brown*, 363 N.C. at 362, 678 S.E.2d at 223. This was especially pertinent to the plaintiff's cause of action for alienation of affections because the "plaintiff's wife and [the] defendant committed adultery during these business trips[.]" *Id.* Moreover, the plaintiff in *Brown* submitted an affidavit alleging that "the majority of [the] defendant's conduct which constitutes an alienation of affections occurred within the jurisdiction of North Carolina" and that "[e]vidence as to the frequent electronic and telephonic contact between defendant and plaintiff's spouse can be established through records and witnesses located in the State of North Carolina." *Id.* The evidence of numerous phone calls and communications in *Brown* was important because the defendant made these contacts in order to engage in conduct constituting an alienation of affection, including meetings and out-of-town travel with the plaintiff's spouse. The foregoing were sufficient "act[s] by which defendant purposefully availed [him]self of the privilege of conducting activities within the forum State[.]" *Charter Med., Ltd.*, 173 N.C. App. at 216, 617 S.E.2d at 355.

In this case, Plaintiff places emphasis on the fact that in both the present case and in *Brown* there were numerous phone calls from the defendants to North Carolina. Plaintiff states that the Thompsons and their agents made more than 100 telephone calls to Plaintiff in North Carolina and that approximately 40 telephone calls and 25 emails were related to the First Agreement. However, phone calls, like contracts, do not *automatically* establish the necessary minimum contacts with this State for the establishment of personal jurisdiction. We

reiterate that "there be some act by which defendant purposefully availed itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protection of its laws. . . . For only then will the non-resident have acted in such a way such that he can reasonably anticipate being haled into court there[.]" *Charter Med., Ltd.*, 173 N.C. App. at 216, 617 S.E.2d at 355; *see also Buck v. Heavner*, 93 N.C. App. 142, 145, 377 S.E.2d 75, 77-78 (1989) (explaining that "[i]n cases involving specific jurisdiction, the focus of the minimum contacts inquiry is on the relationship among the defend-ant, the forum state, and the litigation[;] [t]he resolution of the inquiry necessarily turns on the facts of each case, . . . but it is essential that there be some act by which the defendant purposefully avails himself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of the forum state's laws") (internal citations omitted). In this case, Plaintiff has not demonstrated how the correspondences from the Thompsons to Plaintiff in North Carolina constituted a purposeful availment by the Thompsons "of the privilege of conducting activities within the forum State, thus invoking the benefits and protection of its laws. . . . [such that the Thompsons] can reasonably anticipate being haled into court there[.]" *Charter Med., Ltd.*, 173 N.C. App. at 216, 617 S.E.2d at 355. Moreover, although Plaintiff generally states that "all" of the phone calls and emails were "related to this lawsuit[,]" Plaintiff does not provide any elaboration on how the correspondences related specifically to Plaintiff's only claim against the Thompsons, which sought recovery of the $310,000.00 refundable portion of the deposit pursuant to the First Agreement. *Compare, Brown*, 363 N.C. 360, 678 S.E.2d 222 (holding jurisdiction in North Carolina was proper on the plaintiff's claim of alienation of affection when the defendant corresponded with the plaintiff's wife "almost daily" and planned out-of-state trips with the plaintiff's wife during which time the plaintiff's wife and the defendant committed adultery). Based on the foregoing, we conclude that, on the facts of this particular case, the correspondence by the Thompsons with Plaintiff in North Carolina was insufficient to establish minimum contacts.

For the foregoing reasons, we conclude the trial court did not err by entering the 15 September 2011 order allowing the Thompson's Rule 12(b)(2) motion to dismiss Plaintiff's claims against the Thompsons for lack of personal jurisdiction. The Thompsons did not have sufficient minimum contacts with North Carolina, and thus the

exercise of jurisdiction would not have comported with traditional notions of fair play and substantial justice.

AFFIRMED.

Judges CALABRIA and ERVIN concur.