Banc of Am. Merch. Servs., LLC v. Arby's Rest. Grp., Inc., 2021 NCBC 42.

STATE OF NORTH CAROLINA

MECKLENBURG COUNTY

BANC OF AMERICA MERCHANT
SERVICES, LLC,

    Plaintiff and Counterclaim
    Defendant,

v.

ARBY'S RESTAURANT GROUP,
INC.,

    Defendant, Counterclaim
    Plaintiff, and Third-Party
    Plaintiff,

v.

VISA, INC.; and MASTERCARD
INTERNATIONAL INC.,

    Third-Party Defendants.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
20 CVS 426

**ORDER AND OPINION
ON THIRD-PARTY DEFENDANTS
VISA, INC.'S AND MASTERCARD
INTERNATIONAL INC.'S
MOTIONS TO DISMISS**

1. This case arises out of an indemnification dispute between Banc of America Merchant Services, LLC ("BAMS") and Arby's Restaurant Group, Inc. After a data security incident at Arby's restaurants across the country, Visa, Inc. and Mastercard International Inc. assessed roughly $20 million in fees on Bank of America, N.A. ("BANA"), the bank that sponsored Arby's as a participating merchant in Visa's and Mastercard's payment card networks. BAMS, as BANA's assignee, sought reimbursement from Arby's for those assessments, but Arby's refused. So BAMS filed this suit against Arby's.

2. Arby's denies any responsibility for the incident and any duty to indemnify BAMS. It also contends that Visa and Mastercard should not have imposed the

assessments in the first place. It has brought third-party claims against Visa and Mastercard, seeking to challenge the assessments as BANA's equitable subrogee.

3. Visa and Mastercard have moved to dismiss the third-party complaints against them for lack of personal jurisdiction, improper venue, and failure to state a claim. (ECF Nos. 67, 71.) For the following reasons, the Court concludes that it lacks personal jurisdiction over Visa and Mastercard, dismisses the third-party complaints on that basis, and denies all other requested relief as moot.

> *McGuireWoods LLP, by Jodie Herrmann Lawson, and Covington & Burling LLP, by Alexander A. Berengaut, for Plaintiff/Counterclaim Defendant Banc of America Merchant Services, LLC.*
>
> *Smith, Anderson, Blount, Dorsett, Mitchell & Jernigan, L.L.P., by Christopher G. Smith, and Orrick, Herrington & Sutcliffe LLP, by Seth Harrington and Douglas H. Meal, for Defendant/Counterclaim Plaintiff/Third-Party Plaintiff Arby's Restaurant Group, Inc.*
>
> *Bradley Arant Boult Cummings LLP, by C. Bailey King, Jr. and Bridget V. Warren, and O'Melveny & Myers LLP, by Randall W. Edwards, Megan Havstad, and Eric Ormsby, for Third-Party Defendant Visa Inc.*
>
> *Cozen O'Connor, by Tracy L. Eggleston, and Golenbock Eiseman Assor Bell & Peskoe LLP, by Martin S. Hyman and Matthew C. Daly, for Third-Party Defendant Mastercard International, Inc.[1]*

Conrad, Judge.

I.
DISCUSSION

4. When a defendant moves to dismiss for lack of personal jurisdiction, the plaintiff must establish, by a preponderance of the evidence, a prima facie case that jurisdiction exists. *See Bauer v. Douglas Aquatics, Inc.*, 207 N.C. App. 65, 68 (2010).

---

[1] After these motions were filed, the Court granted Ms. Warren, Ms. Lawson, and Ms. Havstad leave to withdraw as counsel. (ECF Nos. 93, 131, 136.)

Here, the parties rely on dueling affidavits, exhibits, and the allegations in the third-party complaints. In such a case, "the trial judge must determine the weight and sufficiency of the evidence presented in the affidavits much as a juror." *Capitala Grp., LLC v. Columbus Advisory Grp. LTD*, 2018 NCBC LEXIS 183, at *3 (N.C. Super. Ct. Dec. 3, 2018) (citation and quotation marks omitted). The Court must make findings of fact "adequate to resolve its inquiry," and must "resolv[e] contested facts as necessary." *Diamond Candles, LLC v. Winter*, 2020 NCBC LEXIS 28, at *12 (N.C. Super. Ct. Mar. 12, 2020) (citation omitted), *aff'd per curiam*, 2021-NCSC-59. Once a defendant offers evidence to support its challenge to jurisdiction, "the allegations of an unverified complaint can no longer be taken as true or controlling," although the Court will "construe uncontroverted allegations in the complaint in plaintiff's favor." *Id.* at *12–13 (citations omitted).

5.     The motions have been fully briefed, and the Court held a hearing in August 2020. Having considered all relevant matters, the Court finds the following facts by a preponderance of the evidence and makes the following conclusions of law.

## A. Findings of Fact

6.     This case involves the relationship between the various players involved in credit and debit card transactions. The relevant facts are more or less undisputed.

7.     Visa and Mastercard operate the payment card networks that facilitate transactions between merchants and consumers. (*See* Aff. of Chad Stout ¶ 2, ECF No. 73 ["Stout Aff."]; Aff. of Marie Russo ¶ 8, ECF No. 69 ["Russo Aff."].) Both card organizations are incorporated in Delaware, with Visa headquartered in California

and Mastercard headquartered in New York. (*See* Visa Compl. ¶ 10, ECF No. 42; Stout Aff. ¶ 2; Mastercard Compl. ¶ 10, ECF No. 43; Russo Aff. ¶ 3.)

8.    Visa and Mastercard do not issue the credit and debit cards that bear their logos, and they do not have a direct relationship with the consumers who use the cards or with the merchants that accept them. (*See* Stout Aff. ¶¶ 2, 4; Russo Aff. ¶¶ 10, 12, 23, 24.) Instead, issuing banks ("issuers") and acquiring banks ("acquirers") contract with the card organizations to use their trademarks and participate in their networks. Issuers provide cards to consumers, and acquirers provide merchants with access to the payment networks. (*See, e.g.*, Stout Aff. ¶¶ 2, 4; Russo Aff. ¶¶ 8–10, 12, 23, 24.)

9.    BANA is an issuer and an acquirer for Visa and Mastercard. (*See* Visa Compl. ¶ 33; Stout Aff. ¶ 3; Mastercard Compl. ¶ 32; Russo Aff. ¶¶ 9, 13.) It was headquartered in California until 1999 when it moved to North Carolina. (*See* Russo Aff. ¶ 14.)[2] BAMS is an affiliate of BANA. It is a Delaware company that, at all times relevant, was headquartered in Georgia.[3]

---

[2] *See Bank of America, National Association*, FDIC, https://banks.data.fdic.gov/bankfind-suite/bankfind/details/3510 (last updated June 25, 2021) (navigate to "History" tab). The Court may take judicial notice of information on the FDIC's official website about FDIC-regulated banks. *See* N.C. R. Evid. 201(b), (c); *e.g.*, *Tehranchi v. Plan River Inv., LLC*, 2012 U.S. Dist. LEXIS 200080, at *7 (C.D. Cal. May 2, 2012).

[3] BAMS moved to North Carolina in 2020. *See Application for Certificate of Authority for Limited Liability Company for Banc of America Merchant Services, LLC* (SOSID: 1119625) (filed Oct. 14, 2009), available at https://www.sosnc.gov/; *Limited Liability Company Annual Report for Banc of America Merchant Services, LLC* (SOSID: 1119625) (filed Apr. 3, 2020), available at https://www.sosnc.gov/. The Court may take judicial notice of public filings available on the North Carolina Secretary of State's official website. *See* N.C. R. Evid. 201(b), (c); *e.g.*, *Willard v. Barger*, 2020 NCBC LEXIS 117, at *25 (N.C. Super. Ct. Oct. 9, 2020).

10. BANA's agreement with Mastercard dates back to October 1976. It was formed between Mastercard's predecessor (Interbank Card Association) and BANA's predecessor (Bank of America NT&SA), which was headquartered in California at the time. (*See* Russo Aff. ¶¶ 13, 14; Russo Aff. Ex. 3, ECF No. 69.4 ["Mastercard Agrmt."].) The agreement contains a New York choice-of-law clause. (*See* Mastercard Agrmt. § 19; Russo Aff. ¶ 19.) And Mastercard's "Rules," which are incorporated by reference, contain New York forum-selection and choice-of-law clauses. (Russo Aff. Ex. 1 § 2.4, ECF No. 69.2; Russo Aff. ¶ 20.) There is no evidence in the record of where the agreement was negotiated or signed.

11. BANA has also had a long relationship with Visa, though their current agreement is more recent, dated October 2014. (*See* Stout Aff. ¶ 3; Stout Aff. Ex. 1, ECF No. 75 ["Visa Agrmt."].) It too contains New York forum-selection and choice-of-law clauses. (*See* Visa Agrmt. § 18.1(r), (s).) Notices must be sent to BANA in North Carolina with copies to its offices in Delaware, Illinois, and Texas. (*See* Visa Agrmt. § 18.1(h).) Again, there is no evidence in the record of where the agreement was negotiated or signed.

12. Each agreement contemplates that BANA will contract with merchants as an acquirer to enable those merchants to participate in the Visa and Mastercard payment networks. Less relevant here, though also covered by the agreements, are BANA's activities as an issuer. (*See, e.g.*, Stout Aff. ¶ 3; Visa Agrmt. § 2.1; Russo Aff. ¶¶ 9, 13; Mastercard Agrmt. at 1.) Both agreements have a wide geographic scope. The Visa agreement applies to BANA's activities throughout the United States. (*See*

Visa Agrmt. § 12.1(b).) The Mastercard agreement applies to BANA's activities not only in the United States but also in Canada, Hong Kong, Singapore, Australia, India, and elsewhere. (*See* Russo Aff. ¶ 15; Russo Aff. Ex. 4, ECF No. 69.5.)

13. As an acquirer, BANA must ensure that its affiliated merchants abide by various rules—including rules related to data security—promulgated by the card organizations. (*See* Stout Aff. ¶ 5; Stout Aff. Exs. 2, 4, ECF Nos. 76, 78; Russo Aff. ¶¶ 10, 11; Russo Aff. Ex. 1; Russo Aff. Ex. 2, ECF No. 69.3.) Compliance with industry standards for data security, formally called the Payment Card Industry ("PCI") Data Security Standards, is also mandatory. (*See* Stout Aff. ¶ 5.) If there is a data breach, BANA must take additional actions, including engaging an independent forensic specialist to investigate. (*See* Russo Aff. ¶ 30; Russo Aff. Ex. 2 § 10.2.2.1; Stout Aff. Ex. 2 at 12–13.)

14. Noncompliance with card organization rules or industry data security standards may result in fines and fees. Visa and Mastercard have each established programs designed to remedy losses from security breaches and to allocate responsibility for them. (*See, e.g.*, Stout Aff. ¶ 6; Russo Aff. ¶¶ 11, 25.) Visa has the Account Information Security ("AIS") and Global Compromised Account Recovery ("GCAR") programs, and Mastercard has the Account Data Compromise ("ADC") program. (*See* Stout Aff. ¶¶ 1, 7–10; Russo Aff. ¶¶ 1, 25–27.) In short, if the card organizations conclude that a data breach occurred due to noncompliance, they may impose assessments on the acquirer, ostensibly to compensate issuers and to ensure that consumers suffer no financial loss. (*See* Stout Aff. ¶¶ 6–9; Russo Aff. ¶¶ 25–27.)

Visa and Mastercard do not require the acquirer to pass the assessments on to the merchant, nor are they involved in any decision by the acquirer to seek reimbursement or indemnification from the merchant. (*See* Stout Aff. ¶ 8; Russo Aff. ¶¶ 28, 43.)

15.     One of BANA's affiliated merchants is Arby's, which owns and franchises a nationwide chain of fast-food restaurants. Arby's is incorporated in Delaware and headquartered in Georgia. (*See* Visa Compl. ¶¶ 9, 34; Mastercard Compl. ¶¶ 9, 33.)

16.     Arby's entered into a merchant agreement with BANA in December 2009. (*See* App. Ex. A, ECF No. 33.1 ["Merchant Agrmt."].) Among other things, the agreement enables Arby's to accept Visa and Mastercard payment cards at its restaurants, requires Arby's to comply with each card organization's rules and the PCI Data Security Standards, and delegates to Arby's the responsibility to engage a forensic investigator after a suspected data breach. (*See* Merchant Agrmt. §§ 1, 7(A)(xi), 13.) There are two indemnification provisions of varying (and disputed) scope. (*See* Merchant Agrmt. §§ 10(B), 21.)

17.     In early 2017, Arby's reported that it had suffered a significant data security incident involving criminal infiltration into its computer network and resulting in the theft of its customers' payment card data. (*See* Visa Compl. ¶¶ 37–41; Mastercard Compl. ¶¶ 36–40.) Arby's hired a forensic investigation firm. (*See* Visa Compl. ¶ 38; Mastercard Compl. ¶ 37; Russo Aff. ¶ 30.) This firm, called CrowdStrike, conducted its investigation from its California headquarters, collecting data remotely from the Georgia headquarters of Arby's as well as from over a thousand restaurants across

the country.  (*See* Russo Aff. ¶¶ 31, 32.)  Neither CrowdStrike nor Arby's sent anyone to North Carolina in connection with the investigation.  (*See* Russo Aff. ¶¶ 33, 34.)

18.    After CrowdStrike finished its investigation, Visa and Mastercard reviewed its findings and performed their own investigations.  They reached the same conclusion: that Arby's had not complied with industry standards.  (*See, e.g.*, Stout Aff. ¶ 11; Russo Aff. ¶ 35.)  Visa and Mastercard then imposed assessments on BANA as part of the GCAR, AIS, and ADC programs.  BANA appealed all three assessments with help from Arby's.  Mastercard agreed to reduce its assessment, but Visa denied the appeals and imposed an additional appeal fee.

19.    Visa's investigation was "conducted and finalized in the San Francisco Bay Area," and "no aspect" of the investigation or decision "was carried out in North Carolina."  (Stout Aff. ¶ 12.)  Mastercard's investigation took place in New York and Missouri.  (*See* Russo Aff. ¶ 44.)  There is no evidence that either card organization sent employees to North Carolina or met with representatives of Arby's, BANA, or BAMS in North Carolina.  (*See* Stout Aff. ¶ 12; Russo Aff. ¶ 44.)  The primary contact at BANA for communications concerning the investigations and assessments was in Kentucky.  (*See* Russo Aff. ¶¶ 36, 38.)  Although Arby's has offered evidence that Visa and Mastercard also communicated with a BAMS employee in North Carolina, it has not shown how many communications there were or what they concerned.  (*See* Aff. of Nils Okeson ¶¶ 7, 8, ECF No. 108.)

20.    All told, the assessments amounted to roughly $20 million.  (*See* Stout Aff. ¶ 11; Russo Aff. ¶¶ 35, 39.)  Visa debited its assessment from BANA's bank account

in New York. (*See* Stout Aff. ¶ 13.) Mastercard also sent its invoice to BANA in New York. (*See* Russo Aff. ¶ 41.)

21. After BANA paid the assessments, a dispute arose that led to this lawsuit. BANA sought reimbursement from Arby's under the merchant agreement, but Arby's refused. BANA assigned its claims to BAMS, which filed suit against Arby's for breach of contract. (ECF No. 3.) Arby's denies that it has any duty to indemnify BAMS.

22. In addition, Arby's has brought third-party claims against Visa and Mastercard. (*See* Visa Compl.; Mastercard Compl.) Arby's maintains that the assessments were unlawful. It has asserted direct claims for unjust enrichment, contribution, and violations of California and Georgia statutes governing unfair business practices. Arby's also asserts several other claims as BANA's equitable subrogee on the theory that it may challenge the assessments under the Visa and Mastercard acquirer agreements. Visa and Mastercard have moved to dismiss the claims for various reasons, including lack of personal jurisdiction.

## B. Conclusions of Law

23. "Personal jurisdiction refers to the Court's ability to assert judicial power over the parties and bind them by its adjudication." *In re A.B.D.*, 173 N.C. App. 77, 83 (2005) (citation and quotation marks omitted). Determining whether personal jurisdiction exists is usually a "two-step analysis": jurisdiction must be authorized by the State's long-arm statute and consistent with the federal Due Process Clause.

*Beem USA LLLP v. Grax Consulting LLC*, 373 N.C. 297, 302 (2020). The parties address only the second, constitutional step, so the Court does the same.

24. The Fourteenth Amendment's Due Process Clause requires that a defendant "have certain minimum contacts" with the forum State such that the exercise of jurisdiction over the defendant is "reasonable" and "does not offend 'traditional notions of fair play and substantial justice.' " *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316–17 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)). The "primary focus" of this inquiry "is the defendant's relationship to the forum State." *Bristol-Myers Squibb Co. v. Superior Court*, 137 S. Ct. 1773, 1779 (2017).

25. Sometimes, the relationship is exceptionally close. A court has general jurisdiction "to hear any and all claims against" defendants whose contacts "are so continuous and systematic as to render them essentially at home in the forum State." *Goodyear Dunlop Tires Operations, S. A. v. Brown*, 564 U.S. 915, 919 (2011) (citation and quotation marks omitted). That is not the case here. North Carolina is not home to Visa or Mastercard. (*See* Opp'n to Visa 1–7, ECF No. 106; Opp'n to Mastercard 1–7, ECF No. 107.)

26. More commonly, a "nonresident defendant has situational, rather than systematic, contacts with the forum State." *Lunsford v. ViaOne Servs., LLC*, 2020 NCBC LEXIS 127, at *9 (N.C. Super. Ct. Oct. 28, 2020). These more limited contacts may give rise to "specific or case-linked jurisdiction," *Goodyear*, 564 U.S. at 919, depending on "the relationship among the defendant, the forum, and the litigation," *Daimler AG v. Bauman*, 571 U.S. 117, 133 (2014) (citation and quotation marks

omitted). There must be a nexus between the forum and the underlying controversy such that "the suit arises out of or relates to the defendant's contacts with the forum." *Goodyear*, 564 U.S. at 923–24 (cleaned up); *see also Skinner v. Preferred Credit*, 361 N.C. 114, 122 (2006).

27. A crucial factor is foreseeability—whether the defendant's contacts with the forum are such that it should "reasonably anticipate being haled into court there." *Beem*, 373 N.C. at 303 (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)). This typically requires evidence of "some act by which the defendant purposefully avail[ed] itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Hanson v. Denckla*, 357 U.S. 235, 253 (1958). Due process does not permit a court to exercise jurisdiction based on "a defendant's 'random, fortuitous, or attenuated' contacts with the forum state." *Beem*, 373 N.C. at 303 (quoting *Walden v. Fiore*, 571 U.S. 277, 286 (2014)).

28. Even substantial contacts may be inadequate if they do not give rise to or relate to the plaintiff's claims. As the United States Supreme Court recently reiterated, specific jurisdiction "covers defendants less intimately connected with a State, but only as to a narrower class of claims." *Ford Motor Co. v. Mont. Eight Jud. Dist. Ct.*, 141 S. Ct. 1017, 1024 (2021). Absent some meaningful relationship between the defendant's forum-related activity and the claims, "specific jurisdiction is lacking regardless of the extent of a defendant's unconnected activities in the State." *Bristol-Myers*, 137 S. Ct. at 1781; *see also Ford*, 141 S. Ct. at 1024–25.

29.    At issue here are claims brought by a company based in Georgia (Arby's) against companies based in California (Visa) and New York (Mastercard). The events that gave rise to these claims occurred outside North Carolina. Visa and Mastercard conducted their investigations of the 2017 data security incident from their home offices and, in Mastercard's case, a satellite office in Missouri. Neither sent employees to North Carolina for any purpose. Nor did the California-based investigator hired by Arby's. When Visa and Mastercard issued their assessments and entertained the resulting appeals, they communicated primarily with a BANA employee in Kentucky and with others in Virginia and California. And when Visa and Mastercard collected the assessments from BANA, they did so through its accounts in New York. (*See, e.g.*, Stout Aff. ¶¶ 11–13; Russo Aff. ¶¶ 31–42, 44.)

30.    Still, Arby's argues that Visa and Mastercard have sufficient minimum contacts to support the exercise of personal jurisdiction. Arby's points to the acquirer agreements with BANA as evidence of the card organizations' longstanding business relationships with a North Carolina resident. Arby's further contends that its claims—especially those asserted as BANA's subrogee—arise from or are related to these agreements.[4]

31.    Courts have long rejected the notion that "an individual's contract with an out-of-state party *alone* can automatically establish sufficient minimum contacts in

---

[4] "[M]any courts have held that specific jurisdiction should be decided on a claim-by-claim basis." *JCG & Assocs., LLC v. Disaster Am. USA, LLC*, 2019 NCBC LEXIS 112, at *10 (N.C. Super. Ct. Dec. 19, 2019) (first citing *Marten v. Godwin*, 499 F.3d 290, 296 (3d Cir. 2007); then citing *Phillips Exeter Acad. v. Howard Phillips Fund, Inc.*, 196 F.3d 284, 289 (1st Cir. 1999)). No party has argued that the jurisdictional analysis plays out differently for the direct claims than it does for the subrogated claims.

the other party's home forum." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 478 (1985). The plaintiff must show something more: the suit must be based on a contract with a "substantial connection with this State." *Beem*, 373 N.C. at 304 (citation and quotation marks omitted). This involves looking to prior negotiations, contemplated future consequences, the terms of the contract itself, and the parties' actual course of dealing. *See Burger King*, 471 U.S. at 479.

32. Arby's has not carried its burden. It has not offered any evidence to show who contacted whom to begin negotiations, where the negotiations occurred, or where the acquirer agreements were signed. The circumstances suggest that Visa and Mastercard did not reach into North Carolina to begin a relationship with BANA. Indeed, BANA was headquartered in California when it contracted with Mastercard in 1976. And according to Arby's, Visa's relationship with BANA began even earlier. (*See* Opp'n to Visa 3.) This cuts against a finding of purposeful availment. *See, e.g.*, *Cambridge Homes of N.C. L.P. v. Hyundai Constr., Inc.*, 194 N.C. App. 407, 413 (2008) ("Which party initiates the contact is taken to be a critical factor in assessing whether a nonresident defendant has made purposeful availment of the privilege of conducting activities within the forum State." (citation and quotation marks omitted)).

33. Although Arby's insists that Visa and Mastercard "knew that BANA would perform its obligations in North Carolina," (Opp'n to Visa 3–4; Opp'n to Mastercard 3), that is "an inference unsupported by the evidence," *US Chem. Storage, LLC v. Berto Constr., Inc.*, 253 N.C. App. 378, 386 (2017). The agreement itself is largely silent about where performance must occur. Arby's has not pointed to any terms that

require BANA to perform contractual services in North Carolina. Likewise, Arby's has not offered any evidence that the contracting parties expected BANA to perform services in the State.

34. At most, the agreements broadly allow BANA to act as an acquirer for merchants located throughout the United States (and overseas for Mastercard). (*See* Visa Agrmt. § 12.1(b); Russo Aff. ¶ 15; Russo Aff. Ex. 4.) But there is no reason to believe that BANA—a large financial institution with offices around the country—necessarily performs these services at its headquarters in North Carolina. No evidence shows that it does. In fact, the key activities in this case were performed elsewhere: BANA served as an acquirer for a *Georgia* merchant and dealt with the card organizations' assessments and appeals through personnel in *Kentucky*. When the contract does not specify performance within the forum and contractual services are in fact performed elsewhere, the case for personal jurisdiction is substantially weakened. *See Lulla v. Effective Minds, LLC*, 184 N.C. App. 274, 279 (2007) ("Nothing in the contract specified that any work performed under the contract was to be performed in North Carolina. In fact, . . . the work performed was completed in New Jersey and Texas, not in North Carolina."); *see also Capitala*, 2018 NCBC LEXIS 183, at *11–13; *WLC, LLC v. Watkins*, 454 F. Supp. 2d 426, 438 (M.D.N.C.) (R. & R.), *adopted*, 454 F. Supp. 2d 426 (M.D.N.C. 2006).

35. It bears repeating that Visa and Mastercard carried out their own contractual duties outside North Carolina. Neither sent employees to North Carolina during their investigations or after, and both communicated with BANA personnel

elsewhere. Arby's contends that the card organizations also communicated with one BAMS (not BANA) employee in North Carolina, but its evidence is conclusory. It is unclear what the role of this employee was, how many communications there were, and what was said. Without more, this is not the kind of purposeful contact that due process requires. *See, e.g.*, *Miller v. Szilagyi*, 221 N.C. App. 79, 92–93 (2012) (concluding that over 100 telephone calls to plaintiff in North Carolina did not establish sufficient minimum contacts); *Le Bleu Corp. v. Standard Cap. Grp., Inc.*, 11 F. App'x 377, 380 (4th Cir. 2001) (holding no personal jurisdiction despite visits and communications to North Carolina); *Capitala*, 2018 NCBC LEXIS 183, at *14 (same).

36. Both agreements also contain New York forum-selection and choice-of-law clauses. When entering into the agreements, Visa and Mastercard (and BANA) would have expected disputes arising from the agreements to be resolved in a New York court under New York law.[5] Neither could have "reasonably anticipate[d] being haled into" a North Carolina court by a Georgia plaintiff. *Beem*, 373 N.C. at 303 (citation and quotation marks omitted). Moreover, North Carolina's interest in resolving a dispute between nonresident entities based on the laws of another State is not immediately obvious. *See Tejal Vyas, LLC v. Carriage Park Ltd. P'ship*, 166 N.C.

---

[5] Visa and Mastercard contend that the forum-selection clauses require the third-party claims to be litigated in New York and that venue is improper here. Although Arby's seeks to enforce the acquirer agreements, it argues that it is not bound by their forum-selection clauses. Having concluded that personal jurisdiction is lacking, the Court need not resolve the venue dispute. *See, e.g.*, *Sutton v. Houllou*, 191 A.D.3d 1031, 1034 (N.Y. App. Div. 2021) ("Under the 'closely related' doctrine, a forum selection clause may also be enforced against a non-signatory." (citation omitted)); *Schwarz v. St. Jude Med., Inc.*, 254 N.C. App. 747, 752–53 (2017) (holding that the scope of a forum-selection clause is determined by applying the law specified by a contract's choice-of-law provision).

App. 34, 41 (2004) (observing that Illinois choice-of-law clause weighed against personal jurisdiction), *aff'd per curiam*, 359 N.C. 315 (2005).

37.     For these reasons, this case is significantly different than those cited by Arby's, including *Burger King*. There, a Michigan franchisee contested personal jurisdiction in Florida. His challenge failed because the franchise agreement was made in Florida, the "contract documents themselves emphasize[d] that Burger King's operations [were] conducted and supervised from the Miami headquarters," the parties' "actual course of dealing repeatedly confirmed that decisonmaking authority was vested in the Miami headquarters," there was "a continuous course of direct communications" with Burger King's Florida-based employees, and the agreement included a Florida choice-of-law provision. *Burger King*, 471 U.S. at 480–81.

38.     These hallmarks of jurisdiction are absent here. There's no evidence that the acquirer agreements were negotiated or made in North Carolina. The agreements do not say that BANA will perform its operations from its North Carolina headquarters. Actual performance—certainly for the events at issue—took place elsewhere. And the terms of the agreement designate New York as the venue of choice and the source of governing law. The only connection to North Carolina is that BANA is headquartered here. That is not enough, as *Burger King* itself makes clear. *See id*. at 478; *see also US Chem. Storage*, 253 N.C. App. at 386; *Bank of Am., N.A. v. Corporex Cos., LLC*, 2014 U.S. Dist. LEXIS 102670, at *8–9 (W.D.N.C. July 28, 2014).

39. Other arguments pressed by Arby's are equally unpersuasive. Arby's stresses, for example, that Visa and Mastercard have had "long-standing" relationships with BANA, a North Carolina resident. (Opp'n to Visa 2; Opp'n to Mastercard 2.) Again, the fact that BANA happens to have its headquarters in North Carolina does not, by itself, support jurisdiction. That remains true regardless of how long it has resided in the State. In fact, the length of the relationship cuts the other way because the card organizations' relationships with BANA began when it was a California resident.

40. Arby's also argues that the Court has personal jurisdiction over Visa and Mastercard because their assessments injured a North Carolina resident. (*See* Opp'n to Visa 2, 5; Opp'n to Mastercard 3, 5.) The United States Supreme Court has rejected that argument. "The proper question is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects him to the forum in a meaningful way." *Walden*, 571 U.S. at 290; *see also Bank of Am.*, 2014 U.S. Dist. LEXIS 102670, at *9 (following *Walden*).

41. It is tempting to cast all this aside and find jurisdiction because Visa and Mastercard are omnipresent in modern commercial life. Neither could complain that litigating in North Carolina is inconvenient. But to do so would dissolve the barrier between general and specific jurisdiction for many large corporations. And it would weaken our federal system of shared sovereignty. Restrictions on personal jurisdiction "are more than a guarantee of immunity from inconvenient or distant

litigation. They are a consequence of territorial limitations on the power of the respective States." *Hanson*, 357 U.S. at 251.

42. In short, Arby's has not met its burden to show that its claims arise from or relate to the contacts that Visa or Mastercard have had with this State. The acquirer agreements are not adequate to show purposeful availment, and there is no "affiliation between the forum and the underlying controversy." *Ford*, 141 S. Ct. at 1025 (citation and quotation marks omitted). The Court therefore concludes that it may not exercise personal jurisdiction over Visa or Mastercard.

43. One final matter remains. In a two-sentence footnote, Arby's asks to conduct jurisdictional discovery. (*See* Opp'n to Visa 7 n.10; Opp'n to Mastercard 7 n.5.) "Whether to grant jurisdictional discovery is within the Court's discretion, but the party seeking discovery must offer more than speculation or conclusory assertions about contacts with a forum state." *Azure Dolphin, LLC v. Barton*, 2017 NCBC LEXIS 90, at *12 (N.C. Super. Ct. Oct. 2, 2017) (citation and quotation marks omitted), *aff'd*, 371 N.C. 579 (2018). In its conclusory footnote, Arby's has not explained why jurisdiction would be found if discovery were permitted. *See, e.g.*, *Genzyme Corp. v. Shire Human Genetic Therapies, Inc.*, 906 F. Supp. 2d 9, 19 (D. Mass. 2012). The Court denies the request.

## II.
## CONCLUSION

44. For all these reasons, the Court **GRANTS** Visa's and Mastercard's motions to dismiss for lack of personal jurisdiction. The third-party complaints are **DISMISSED** without prejudice. The motions are otherwise **DENIED as moot**.

**SO ORDERED**, this the 30th day of June, 2021.

                                    /s/ Adam M. Conrad
                                    Adam M. Conrad
                                    Special Superior Court Judge
                                     for Complex Business Cases