Moore v. Brooks, 2025 NCBC 69.

STATE OF NORTH CAROLINA

DURHAM COUNTY

KELLY F. MOORE, individually and as Executor of the ESTATE OF DRUE A. MOORE; MILES MOORE, individually and on behalf of his minor brother, COLE MOORE; KMC MOORE LLC, as Trustee of the REDWOOD TRUST, u/a/d April 10, 2017; and RICK GRAVES, as Trustee of the REDWOOD LIFE INSURANCE TRUST u/a/d November 15, 2018,

          Plaintiffs,

v.

ROBERT SCOTT BROOKS; WINTHROP INTELLIGENCE, LLC; D. SCOTT ROBINSON; OPES DIRECTED FIDUCIARY SERVICES, LLC; ROBINSON LAW GROUP LLC d/b/a OPES LAW; REDWOOD WI HOLDINGS, LLC; REDWOOD RE I, LLC; REDWOOD RE II, LLC; TETON GLOBAL VENTURES LLC; and DAC WORLDWIDE LLC,

          Defendants.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
25CV001214-310

**ORDER AND OPINION ON MOTION TO DISMISS**

1. This matter is before the Court on the motion to dismiss filed by defendants D. Scott Robinson, Opes Directed Fiduciary Services, LLC ("**ODFS**"), and Robinson Law Group LLC d/b/a Opes Law ("**Opes Law**" and, with ODFS and Robinson, the "**Robinson Defendants**") on 5 May 2025. (ECF No. 29). The Robinson Defendants

seek dismissal under Rule 12(b)(2) of the North Carolina Rules of Civil Procedure, contending that this Court lacks personal jurisdiction over them.

2. The Court held a hearing on the motion on 11 July 2025. (ECF No. 62). Counsel appeared for Plaintiffs and the Robinson Defendants and argued the merits of the motion based on the allegations of the unverified complaint, as well as various affidavits and exhibits. In their arguments, both sides agree that the Court should weigh the competing evidence and ultimately determine disputed factual issues in resolving the motion. (ECF No. 29.2 at 6; ECF No. 51 at 17).

3. Having considered the motion, the amended complaint, the written and oral arguments of counsel, and all appropriate matters of record, the Court hereby **GRANTS** the motion as set forth below, dismissing without prejudice the claims against the Robinson Defendants.

> *Ward and Smith, P.A., by E. Bradley Evans, Gavin B. Parsons, and Jordan Spanner, for Plaintiffs Kelly F. Moore, individually and as executor of the estate of Drue A. Moore; Miles Moore, individually and on behalf of his minor brother, Cole Moore; KMC Moore LLC, as trustee of the Redwood Trust, u/a/d April 10, 2017; and Rick Graves, as trustee of the Redwood Life Insurance Trust u/a/d November 15, 2018.*
>
> *Phelps Dunbar, LLP, by Jonathan Hall, for Defendants D. Scott Robinson; Opes Directed Fiduciary Services, LLC; and Robinson Law Group LLC d/b/a Opes Law.*
>
> *Everett Gaskins Hancock Tuttle Hash LLP, by E.D. Gaskins, Jr. and James M. Hash, for Defendants Robert Scott Brooks and Winthrop Intelligence, LLC.*

Houston, Judge.

# I. FACTUAL BACKGROUND[1]

4. Drue Moore and his cousin Ben Moore formed defendant Winthrop Intelligence, LLC ("**Winthrop**") under Delaware law around 2009. Now a Wyoming limited liability company, Winthrop made money by selling access to a database it created using public records from U.S. universities, including records showing how much university athletic departments paid coaches. (Am. Compl. ¶¶ 2, 50, ECF No. 3; 14 May 2025 Robinson Aff., ECF No. 51.6, ¶ 4).

5. Robinson, a resident of Wyoming, is licensed to practice law in Wyoming and in Colorado. (5 May 2025 Robinson Aff., ECF No. 29.1, ¶¶ 3–4). He has never practiced law in North Carolina, solicited business in the state, or owned property in the state. (ECF No. 29.1, ¶¶ 4–6). Similarly, Opes Law, a Wyoming LLC that was dissolved in 2020, never conducted business, solicited business, or owned property in North Carolina. (ECF No. 29.1, ¶ 9). The same is true of ODFS, a Wyoming LLC that Robinson owns and controls. (ECF No. 29.1, ¶¶ 10–13).

6. Drue first approached Robinson to request legal services at some point between 2009 and 2017 when Robinson was in Wyoming or Colorado. (ECF No. 29.1, ¶ 14).

---

[1] Plaintiffs' first amended complaint is not verified, and the parties have submitted dueling affidavits and other evidence for consideration. Accordingly, the Court summarizes here the relevant uncontradicted allegations of the complaint and the Court's findings as to the remaining issues on which the parties' affidavits differ. *See Little v. Clay*, – N.C. App. –, 915 S.E.2d 303 (2025); *Banc of Am. Sec. LLC v. Evergreen Int'l Aviation, Inc.*, 169 N.C. App. 690, 694 (2005); *Bruggeman v. Meditrust Acquisition Co.*, 138 N.C. App. 612, 615 (2000). In several instances, Defendants explicitly affirm and agree with the allegations of the complaint. (*E.g.*, ECF No. 29.1, ¶¶ 16–17).

7.      Thereafter, Robinson provided various personal legal services for Drue, helping him create at least four Wyoming entities to protect his assets from future creditors: the Redwood Trust, the Redwood Life Insurance Trust, Redwood RE I, LLC, and Redwood RE II, LLC. (ECF No. 29.1, ¶¶ 15–16; Am. Compl. ¶¶ 26, 55–57, 65, 68). Plaintiffs allege that Robinson also helped create a fifth entity, defendant Redwood WI Holdings, LLC. (Am. Compl. ¶¶ 57–58).

8.      Eventually, Robinson became Winthrop's manager and attorney, remaining its manager until 31 January 2025. During that tenure, Robinson never traveled to North Carolina or performed any work in the state. (ECF No. 29.1, ¶¶ 17–18, 22; ECF No. 51.6, ¶ 4). He did, however, sign Winthrop's annual reports and submit them to the North Carolina Secretary of State. (ECF No. 51.4).[2]

9.      ODFS served as the trustee of the Redwood Trust and the Redwood Life Insurance Trust until its removal in early 2025. The Redwood Life Insurance Trust was created to be the beneficiary of a life insurance policy on Drue's life. Drue's wife, Kelly, and two sons, Miles and Cole, were the beneficiaries of that trust. The Redwood Trust, meanwhile, was created by Drue and Robinson to hold and protect Drue's 50% interest in Winthrop. Drue, Kelly, Miles, and Cole were the beneficiaries of the trust, to which Drue also eventually transferred his interest in defendant Teton Global Ventures, LLC, another Wyoming entity. (Am. Compl. ¶¶ 27, 55–56, 60–61, 65–67; 3 Feb. 2025 Robinson Aff. ¶¶ 6–11, 15–16, ECF No. 51.5).

---

[2] As requested by Plaintiffs, the Court takes judicial notice of the filings with the office of the North Carolina Secretary of State pursuant to Rule 201 of the North Carolina Rules of Evidence. (ECF No. 51 at 11 n.2; N.C. R. Civ. P. 201).

10. The Redwood Trust owned Redwood WI Holdings. Eventually, the Redwood Trust's 50% interest in Winthrop was transferred to Redwood WI Holdings, which also owns 100% of defendant DAC Worldwide LLC, yet another Wyoming entity. (Am. Compl. ¶¶ 26, 28, 57–59; ECF No. 51.5, ¶¶ 11–12).

11. In 2020, Drue and Kelly deeded their Durham, North Carolina, residence to Redwood RE I and II. Robinson drafted documents that would have created yet another trust—the Redwood NWM Trust—to hold the membership interests in the two Redwood RE I and II, with ODFS as trustee and Drue, Kelly, Miles, and Cole as beneficiaries. However, the trust documents were never executed. (Am. Compl. ¶¶ 68–71; ECF No. 51.5, ¶ 17; ECF No. 51.2, ¶ 8 & Ex. B).

12. Over the course of the relationship, Robinson received property tax notices for the Durham residence and directed them to Drue for payment. (ECF No. 51.2, ¶ 8 & Ex. C). In addition, Robinson received life insurance premium bills, and Drue sent him checks to pay the premiums. (ECF No. 51.2, ¶ 8 & Ex. A).

13. Drue and Robinson's relationship deteriorated sharply around September 2024, when Robinson and defendant Robert Scott Brooks, Winthrop's chief investment and financial officer, "accused Drue of taking millions of dollars in unauthorized distributions [from Winthrop] over several years." (Am. Compl. ¶ 80). Drue, Robinson, and Brooks met in Scottsdale, Arizona, to discuss the matter. At the meeting, after discussions about alleged wrongdoing by Drue, Robinson "authorized Mr. Brooks to act *on behalf of Winthrop* and in the best interests of the stakeholders of Winthrop, with broad authority to negotiate and implement a discreet and

equitable settlement by year-end, with Drue." (ECF No. 51.6, ¶ 13–15 (emphasis added)).

14. Over the following months, Brooks sent Drue numerous communications—letters, emails, and text messages—concerning Drue's assets, payments to Drue, and Drue's transfer of assets to Winthrop to pay the company for his alleged misappropriations, among other matters. (*E.g.*, ECF Nos. 51.7–51.16). Brooks often referred to the "Trustee" in these communications, apparently referring to Robinson in his representative capacity on behalf of ODFS, and at times he referred to Robinson directly:

    a. "I was asked to work with you because the Trustee is on a limited schedule due to health issues as well as to accommodate your rapid funding request." (ECF No. 51.7);

    b. "The October bills [sic] amounts are approved and can be funded once the Trustee's terms and conditions are met." (ECF No. 51.7);

    c. "Additionally, the Trustee wanted me to stress that, while he is supporting this request at this moment, future reductions in your cash demands will be a necessary reality so that you can contribute materially to the payback of the $5,400,000 +/- in excess withdrawals." (ECF No. 51.7);

    d. "Drue, <u>why</u> challenge Trustee? His mandate on cars was clear." (ECF No. 51.9);

    e. "All I need you to do is read this with care and then simply write me back that 'it is accurate' so I can then inform the Trustee that both you and I believe it to be a solid statement." (ECF No. 51.10);

    f. "I have input on those figures and will explain to the Trustee on Tuesday what you have put forth." (ECF No. 51.10);

    g. "Please, I cannot go to Robinson without your Rep." (ECF No. 51.10);

h. "It needs to be clear to Robinson [t]hat you are standing behind the statement." (ECF No. 51.10);

i. "Drue, I think we got lost in detail today. How you fund the Trustee's request is up to you ultimately and he only suggested one way . . . ." (ECF No. 51.11);

j. "What was not clear to me as I write this is are you agreeable to the Trustee's terms or would I more accurately communicate to him they were not accepted and you may present another offer?" (ECF No. 51.11);

k. "This needs to be reversed immediately as that is a charge contrary to the Trustee's spending Freeze." (ECF No. 51.12);

l. "The Trustee has also ruled that any and all travel or similar deposits made other than with your personal funds (regardless of status as non-refundable or not) are company assets." (ECF No. 51.12);

m. "I will then and necessarily (as you saw with Robinson) send you and new Counsel my withdrawal and Failure to Maintain Cooperation letter." (ECF No. 51.13);

n. "Need to rep this to Trustee, am k [sic] understanding it correctly?" (ECF No. 51.14);

o. "The trustee is going to appreciate." (ECF No. 51.15);

p. "You were blowing my mind when your answer to the trustees [sic] request was no. I literally felt like I wasn't hearing that or nobody would say that." (ECF No. 51.15); and

q. "[I]t's equity stake holders, Counsel [Robinson] and Management have expressed that there is no further interest nor possibility of a global settlement involving them." (ECF No. 51.16).

15. In November 2024, Robinson signed two documents, each titled "Assignment and Assumption of Membership Interests," purporting to transfer ownership of Redwood RE I and II from the Redwood NWM Trust to Winthrop. (Am. Compl., Ex. A; ECF No. 51.5, ¶¶ 18–19). Plaintiffs and Robinson agree that the purported transfers were ineffective because the Redwood NWM Trust "was never

created." (ECF No. 51.5, ¶¶ 17–19; Am. Compl. ¶ 106). However, according to Plaintiffs, "Brooks continues to insist that he, Winthrop, and/or unnamed creditors have a claim to Drue and Kelly's residence." (Am. Compl. ¶ 115).

16. Ultimately, through ODFS and the Redwood Trust, Robinson allegedly transferred, or attempted to transfer, certain of the Redwood Trust's and the (non-existent) Redwood NWM Trust's assets to Winthrop and otherwise purportedly made, or attempted to make, various transfers of trust assets to the detriment of Drue or the Moore family. (Am. Compl. ¶¶ 90–115).

17. On 10 January 2025, shortly after receiving an ultimatum from Brooks to transfer property to Winthrop, Drue took his own life. (Am. Compl. ¶¶ 132–36; ECF No. 51.16). After Drue's death, Brooks sent multiple communications to Kelly Moore and Jay Harris, a friend of the Moore family, concerning, among other things, the Moores' house in Durham. In an email to Kelly, he purported to be "writing . . . in coordination with WI's Manager, Scott Robinson." In others, he referred to an unspecified "we" or "us." (ECF No. 51.2, ¶ 13 & Exs. F–I). Robinson also sent Kelly an email after Drue's death, telling her that Drue "embezzled over $5 million from Winthrop" and "was not cooperating fully" with repayment efforts. (ECF No. 51.2, ¶ 13 & Ex. E).

18. At the end of January 2025, ODFS was terminated as trustee of the Redwood Trust and Redwood Life Insurance Trust, and Robinson resigned from his role as manager of Winthrop. (ECF No. 51.5, ¶ 22). Plaintiffs KMC Moore LLC and Rick Graves have since been appointed as the trustees of the Redwood Trust and

Redwood Life Insurance Trust, respectively. (Am. Compl. ¶¶ 23–24; ECF No. 51.5, ¶¶ 7, 15, 23).

19. Plaintiffs filed their initial complaint in this action on 31 January 2025. (ECF No. 2). A little over a month later, on 7 March 2025, Plaintiffs filed an amended complaint, asserting claims for declaratory judgment, intentional infliction of emotional distress, conversion, unjust enrichment, breach of fiduciary duty, constructive fraud, constructive trust, and negligence. (*See generally* Am. Compl.). The action was designated as a complex business case and assigned to the undersigned shortly thereafter. (ECF No. 1).

20. On 5 May 2025, the Robinson Defendants moved to dismiss the claims against them for lack of personal jurisdiction. (ECF No. 29). The parties briefed the motion fully, and the Court subsequently conducted a hearing at which counsel argued the merits of the motion.

## II.    ANALYSIS

21. In general, "[t]he burden is on the plaintiff to prove by a preponderance of the evidence that grounds exist for the exercise of personal jurisdiction over a defendant." *Filmar Racing, Inc. v. Stewart*, 141 N.C. App. 668, 671 (2001) (citation omitted).

22. "Personal jurisdiction refers to the Court's ability to assert judicial power over the parties and bind them by its adjudication." *In re A.B.D.*, 173 N.C. App. 77, 83 (2005) (citation omitted).

23.   Two principal authorities limit North Carolina courts' power to exercise personal jurisdiction: the state's long-arm statute, N.C. Gen. Stat. § 1-75.4, and the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *Shaeffer v. SingleCare Holdings, LLC*, 384 N.C. 102, 106 (2023). However, the limits those authorities set are, for all practical purposes, identical: the long-arm "statute makes available to the North Carolina courts the full jurisdictional powers permissible under federal due process." *Id.* (citation and internal punctuation omitted). Therefore, the Court need only analyze jurisdiction under the Due Process Clause.

24.   Under federal precedent, "a tribunal's authority [to exercise jurisdiction under the Fourteenth Amendment] depends on the defendant's having such 'contacts' with the forum State that 'the maintenance of the suit' is 'reasonable, in the context of our federal system of government,' and 'does not offend traditional notions of fair play and substantial justice.'" *Ford Motor Co. v. Mont. Eighth Judicial Dist. Court*, 592 U.S. 351, 358 (2021) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 319 (1945)).

25.   There are two categories of personal jurisdiction: "general or all-purpose jurisdiction" and "specific or case-linked jurisdiction." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011). General jurisdiction requires that a defendant have "affiliations with the State . . . so 'continuous and systematic' as to render [the defendant] essentially at home in the forum State." *Id.* Specific jurisdiction, on the other hand, is proper only when his "conduct and connection with

the forum State are such that he should reasonably anticipate being haled into court there" in connection with the particular claims at issue in a case. *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980); *see also Ford Motor Co.*, 592 U.S. at 359.

26. For specific jurisdiction, the defendant's contacts with the forum state need not be the continuous and systematic contacts contemplated for general jurisdiction, but "'random, fortuitous, or attenuated' contacts" will not do. *Walden v. Fiore*, 571 U.S. 277, 286 (2014) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)). Accordingly, the plaintiff's claims must arise out of or relate to "some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Beem USA Ltd.-Liab. Ltd. P'ship v. Grax Consulting, LLC*, 373 N.C. 297, 303 (2020) (citation omitted). The defendant's relationship with the forum "must arise out of contacts that the 'defendant *himself*' creates with the forum State," not contacts created only by the plaintiff or third parties. *Walden*, 571 U.S. at 284 (emphasis in original) (citation omitted). "Finding personal jurisdiction without evidence that the defendant intentionally targeted the forum state would 'abandon the heretofore accepted inquiry of whether, focusing upon the relationship between "the defendant, the *forum*, and the litigation," it is fair . . . to subject the defendant to suit there.'" *Mucha v. Wagner*, 378 N.C. 167, 174 (2021) (citation omitted) (emphasis in original).

27. The party initiating contact between the plaintiff and defendant is a "critical factor" in evaluating whether the defendant purposefully availed itself of the privilege

of conducting activities in the forum state. *Banc of Am. Sec. LLC*, 169 N.C. App. at 698 (citation and internal punctuation omitted); c*ompare Inspirational Network*, 131 N.C. App. at 241 (noting defendant purposefully availed itself of the privileges of conducting business in North Carolina by initiating and voluntarily entering into an agreement with a North Carolina based corporation), *with CFA Medical, Inc. v. Burkhalter*, 95 N.C. App. 391, 396 (determining that plaintiff's solicitation of business from an out-of-state defendant, resulting in a business contract, was not enough to confer personal jurisdiction on the defendant).

28.    In general, if a defendant challenges a court's personal jurisdiction, "the plaintiff has the initial burden of establishing *prima facie* that jurisdiction is proper." *Bruggeman v. Meditrust Acquisition Co.*, 138 N.C. App. 612, 615, (2000) (citations omitted); *see also Banc of Am. Sec. LLC v. Evergreen Int'l Aviation, Inc.*, 169 N.C. App. 690, 694 (2005).

29.    If the parties rely on dueling affidavits, exhibits, and other evidence in their respective arguments, the trial court ultimately "must determine the weight and sufficiency of the evidence presented in the affidavits much as a juror" and resolve contested facts as necessary to determine the jurisdictional issue. *Banc of Am. Merch. Servs., LLC v. Arby's Rest. Grp., Inc.*, 2021 NCBC LEXIS 60, at \*3 (N.C. Super. June 30, 2021) (quoting *Capitala Grp., LLC v. Columbus Advisory Grp. LTD*, 2018 NCBC LEXIS 183, at \*3 (N.C. Super. Ct. Dec. 3, 2018); *Diamond Candles, LLC v. Winter*, 2020 NCBC LEXIS 28, at \*12 (N.C. Super. Ct. Mar. 12, 2020)).

30. "Once a defendant offers evidence to support its challenge to jurisdiction, 'the allegations of an unverified complaint can no longer be taken as true or controlling,' although the Court will 'construe uncontroverted allegations in the complaint in plaintiff's favor.'" *Id.* (quoting *Diamond Candles*, 2020 NCBC LEXIS 28, at \*12–13).

31. Here, Plaintiffs do not contend that the Court has general jurisdiction over the Robinson Defendants and instead argue only that the Court has specific jurisdiction over them. (*See generally* ECF No. 51). The Court limits its analysis accordingly.

32. Plaintiffs' arguments in support of the Court's personal jurisdiction over the Robinson Defendants are premised primarily upon contentions that (i) Robinson and Opes Law provided legal services to Drue that concerned property in North Carolina, (ii) Robinson, as manager of Winthrop, signed and filed annual reports with the North Carolina Secretary of State for a number of years before this action commenced, (iii) Robinson "assisted" with management of two Wyoming LLCs (Redwood RE I, LLC and Redwood RE II, LLC) that ultimately took title to North Carolina property and "ensured that Drue received" mail in North Carolina, (iv) Robinson, through ODFS as trustee of the Redwood Life Insurance Trust, collected insurance premiums and paid them to a North Carolina insurer, and (v) Robinson caused Brooks, as his purported agent, to contact, negotiate, and otherwise interact with Drue and others in North Carolina. (ECF No. 51 at 11).

33. Ultimately, the Court determines that these purported contacts are too attenuated to form the basis of specific personal jurisdiction over the Robinson Defendants in this action. Many of the purported contacts simply lack a sufficient connection to North Carolina (such as provision of legal services out of state to a North Carolina resident), while others (such as the contention that Brooks was acting on behalf of Robinson and ODFS rather than Winthrop) are not supported by the evidence.

**a. Attorney-Client Relationship, Trustee Services, and Asset Transfers**

34. Plaintiffs first contend that Robinson and Opes Law are subject to jurisdiction because they formed and participated in an attorney–client relationship with Drue, a North Carolina resident, and created various non-North-Carolina trusts and LLCs for him or for his benefit.

35. The Court determines, however, that the attorney-client relationship at issue does not provide a sufficient basis for personal jurisdiction before this Court.

36. Ultimately, neither the evidence nor the pleadings demonstrate that Robinson marketed his services to North Carolina, solicited Drue in North Carolina, or performed material services for Drue in this state. Rather, it appears that Drue, seeking to protect his assets from creditors, intentionally sought legal advice outside North Carolina and solicited the assistance of Robinson, a Wyoming attorney, and Opes Law in availing himself of the benefits of *Wyoming's* laws. While Robinson and Opes Law created several Wyoming or non-North-Carolina entities for Drue or for Drue's benefit, Drue and Kelly effectuated, or attempted to effectuate, various

transfers at issue in the case, such as real property transfers. (Am. Compl. ¶¶ 68–71; ECF No. 51.5, ¶ 17; ECF No. 51.2, ¶ 8 & Ex. B).

37.     Robinson and Opes Law undisputedly provided services to Drue, who was a North Carolina resident. This alone, however, does not rise to the level of contact with the State of North Carolina necessary to render Robinson and Opes law subject to the Court's jurisdiction. *See, e.g.*, *Diamond Candles*, 2020 NCBC LEXIS 28, at *21–24 (collecting cases and noting that there is "a clear distinction between aiming services at a North Carolina resident and contacts with the North Carolina forum itself").

38.     Nor do ODFS's service as trustee and its purported transfer of trust assets to Winthrop, another Wyoming entity, subject the Robinson Defendants to the jurisdiction of North Carolina's courts. Both sides agree that the Redwood NWM Trust never existed, and the alleged harm to the beneficiaries of the Redwood Trust and Redwood Life Insurance Trust in North Carolina does not suffice to create personal jurisdiction under the circumstances of this case and the minimum contacts analysis. Rather, the North Carolina contacts at issue were, at best, incidental contacts that do not constitute purposeful availment for which ODFS or Robinson reasonably should have foreseen being haled into a North Carolina court based on those minimal contacts. *See, e.g.*, *Walden*, 571 U.S. at 286 (explaining that attenuated contacts are insufficient to confer jurisdiction); *Rose v. Firstar Bank*, 819 A.2d 1247, 1252–55 (R.I. 2003) ("In this case, the beneficiaries have alleged that the bank mismanaged the trust and failed to adequately communicate with them . . . . But any such mismanagement and lack-of-communication decisions necessarily must have

occurred in Ohio, which was the situs of the trust's administration."); *Potter v. Baxter*, 565 P.3d 64, 70–71 (Or. Ct. App. 2025) ("Although trustee sent money from the trust to Oregon and had phone calls with the children about the trust, we have repeatedly held that those acts are insufficient to establish the kind of purposeful direction that is necessary to satisfy the minimum contacts requirement."); *Burgauer v. Burgauer*, 521 P.3d 1160, 1168–70 (Nev. 2022) (unpublished) (concluding that trustee's conversion of $600,000 and failure to make distributions did not establish personal jurisdiction; the plaintiff "only felt the injury in Nevada due to her residence there and not due to any independent action that occurred in Nevada"); *Willow Tree Consulting Grp., LLC v. S.D. Tr. Co.*, 2023 Tex. App. LEXIS 3794, at *21–24 (Tex. App. June 1, 2023) (concluding that Texas courts lacked jurisdiction over South Dakota trustee in suit by "third-party creditor attempting to reach allegedly improper transfers").

39. While there are allegations and there is evidence suggesting that the Robinson Defendants communicated with North Carolina residents and directed conduct that incidentally related to or involved North Carolina residents, the conduct on the whole was not, it appears, directed to North Carolina or in an attempt to avail the Robinson Defendants of the privileges of doing business or otherwise operating in North Carolina.

40. In arguing that a fiduciary relationship—specifically, an attorney–client relationship—between an out-of-state defendant and a forum resident can give rise to specific personal jurisdiction, Plaintiffs rely heavily on *Summit Lodging, LLC v.*

*Jones, Spitz, Moorhead, Baird & Albergotti, P.A.*, 176 N.C. App. 697 (2006), in which a South Carolina attorney and law firm voluntarily created extensive contacts with North Carolina. *Summit Lodging*, 176 N.C. App. at 698–99.

41. In that case, the defendants drafted an LLC operating agreement and filed articles of organization with the North Carolina Secretary of State. *Id.* at 698–99, 703. The LLC's immediate purpose was to purchase a hotel in North Carolina, and the defendants helped it do so, preparing purchase documents, sending a letter to an attorney in North Carolina to request that he act as local counsel, and engaging in other communications by letter and telephone with both that attorney and North Carolina counsel for the seller of the hotel. *Id.* at 699, 703. Later, the defendants sent letters and emails and spoke via telephone to counsel for the seller and one of the seller's affiliates, both North Carolina companies. *Id.* at 699, 703. In effect, the defendants were practicing law with the ultimate purpose that their services generate a substantial effect in North Carolina and were also directing substantial communications to the state. *See generally id.*

42. Ultimately, the Court of Appeals determined that the defendants had "purposefully availed themselves of the privilege of conducting activities within" North Carolina, such that jurisdiction existed over the defendants for claims arising from much of the work the defendants performed on behalf of the plaintiffs. *Id.* at 702–04 (internal punctuation omitted).

43. Here, Plaintiffs argue in their briefing that "Robinson and his entities . . . knew they were providing services for, and directing conduct at, North Carolina

*residents.*" (ECF 51 at 2 (emphasis added)). Providing services for, and directing conduct at, a *resident* of a forum state—without more arising from that residency or materially relating to the forum—does not necessarily warrant a finding of personal jurisdiction where there is no indication that the defendant purposefully availed itself of the benefits of the forum state.

44.    While it was reasonably foreseeable that the *Summit Lodging* defendants would face claims in North Carolina courts when they had negotiated on behalf of Plaintiffs with others in North Carolina, had helped create the North Carolina entity (rather than simply file its annual reports), and directly solicited and engaged local counsel in North Carolina on behalf of the plaintiffs, among other things generating substantive involvement with respect to the state, the Robinson Defendants' legal services for Drue and their connection to North Carolina were far more attenuated. *See Diamond Candles, LLC*, 2020 NCBC LEXIS 28, at \*21 (noting that *Summit Lodging* did not "adopt a bright-line rule that an out-of-state firm's provision of legal services to a North Carolina client in connection with a North Carolina transaction will always support the exercise of personal jurisdiction").

**b. Annual Reports and Corporate Services on Behalf of Winthrop**

45.    Similarly, Winthrop's contacts with North Carolina are not attributable to the Robinson Defendants merely by virtue of Robinson's status as its attorney and manager. Courts may not exercise personal jurisdiction over an officer, director, or agent of a company simply because the *company* is subject to their jurisdiction. *Schaeffer*, 384 N.C. at 116. Instead, the officer or representative generally must have

participated in the actions creating contacts with the forum state, such as by personally taking those actions or directing others to do so. *Id.*

46. The Robinson Defendants' actions with respect to annual report filings and similar corporate services similarly do not rise to the level of contact necessary to compel a finding of personal jurisdiction over them in this action.

47. Though some of Robinson's conduct involved de minimis contacts with North Carolina in his role as an attorney, through ODFS in its role as trustee, or as a manager, such as receiving and transmitting property tax and insurance bills to Drue for payment and filing annual reports with North Carolina's Secretary of State, (ECF No. 51.2, ¶ 8 & Exs. A, C; ECF No. 51.4), such conduct does not rise to the level of purposeful availment or otherwise provide a basis for personal jurisdiction under the circumstances of this case and in connection with the specific claims of this case. *See Ford Motor Co.*, 592 U.S. at 359 (noting that claims must "'arise out of or relate to the defendant's contacts' with the forum" (quoting *Bristol-Myers Squibb Co. v. Super. Ct.*, 582 U.S. 255, 262 (2017))).

### c. Brooks's Conduct Attributed to the Robinson Defendants

48. Plaintiffs also assert that various actions taken by Brooks and Robinson in the months leading up to this lawsuit—following the discovery of Drue's purported misappropriation of Winthrop's assets—give rise to personal jurisdiction over the Robinson Defendants. For example, Plaintiffs contend that *Brooks's* communications with Drue establish that the *Robinson Defendants* purposefully availed themselves

of the privilege of conducting activities in North Carolina, as Plaintiffs contend that Brooks was Robinson's agent.

49.    The problem, however, is that neither Plaintiffs' allegations nor the evidence of record establishes that Brooks was an agent of Robinson or the other Robinson Defendants as opposed to being an agent of *Winthrop*.[3]

50.    Under North Carolina law, an agent's contacts with the state may be attributable to the agent's principal under standard agency law. *Bauer v. Douglas Aquatics, Inc.*, 207 N.C. App. 65, 76 (2010) ("Where N.C. Gen. Stat. § 1-75.2(3) permits the exercise of jurisdiction over a party who is 'legally responsible' for certain acts, even if it did not commit them, we conclude that North Carolina's jurisdiction over Appellant may be premised on either actual or apparent agency.").

51.    "Agency is defined as 'the relationship that arises from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act.'" *Berens v. Berens*, 247 N.C. App. 12, 21 (2016) (quoting *Green v. Freeman*, 233 N.C. App. 109, 112 (2014)). "The principal must intend that the agent shall act for him, the agent must intend to accept the authority and act on it, and the intention of the parties must find expression either in words or conduct between them." *Ellison v. Hunsinger*, 237 N.C. 619, 628 (1953). "There are two essential ingredients in the principal-agent relationship: (1)

---

[3] Indeed, in their briefing, Plaintiffs frequently (and apparently intentionally) conflate the various Defendants, asserting that Brooks was acting "on the authority of 'the Trustee,' Robinson"—even though *ODFS* (not Robinson) was the "trustee," as even Plaintiffs acknowledge in their complaint and their briefing. (ECF No. 51 at 12; ECF No. 51 at 4–5 (asserting that "Robinson, *through his entity ODFS*, was the trustee" (emphasis added)); Am. Compl., ¶¶ 20, 60, 67, 70).

Authority, either express or implied, of the agent to act for the principal, and (2) the principal's control over the agent." *Berens*, 247 N.C. App. at 21 (quoting *Phelps-Dickson Builders, L.L.C. v. Amerimann Partners*, 172 N.C. App. 427, 435 (2005)). As to the second "ingredient," the principal must "retain[] the right 'to control and direct the manner in which the details of the work are to be executed' by his agent." *Vaughn v. N.C. Dep't of Hum. Res.*, 296 N.C. 683, 686 (1979) (quoting *Hayes v. Bd. of Trs.*, 224 N.C. 11, 15 (1944)).

52. Robinson admits that, as manager of Winthrop, he granted Brooks "broad authority to negotiate and implement" a settlement with Drue "*on behalf of Winthrop and in the best interests of the stakeholders of Winthrop*," (ECF No. 51.6, ¶ 15 (emphasis added)), and the Court determines that this was the case.

53. That Brooks was authorized to act on behalf of Winthrop when communicating with Drue in late 2024 and early 2025, however, does not establish that Brooks was authorized to act (or was acting) on behalf of Robinson, even if Robinson served as manager of Winthrop. *See Green*, 233 N.C. App. at 113 ("Although we agree that this letter and the other evidence could establish an agency relationship, plaintiffs misidentify the principal. This evidence, in the light most favorable to plaintiffs, shows that Corinna appointed Jack a general agent on behalf of 'the company' in her capacity as 'Chairperson.'").

54. Assuming the communications' evidentiary competence for present purposes, the substance of Brooks's correspondence with Drue does not change this analysis. Brooks sent numerous communications to Drue in which Brooks referenced

the "Trustee" or the "Trustee's" actions, thoughts, or positions regarding negotiated resolutions, terms of proposals, and other desires or goals with respect to Drue's conduct the parties' relationships. (*See generally, e.g.*, ECF Nos. 51.7, 51.10–51.12, 51.15–51.16).

55.     Many communications referred to an unspecified "we" or "us," though at least one communication after Drue's death suggested that Brooks was "writing . . . in coordination with WI's Manager, Scott Robinson." (ECF No. 51.2, ¶ 13 & Exs. F–I).

56.     Even if Robinson did direct the making of certain statements, however, mere communications alone, when not targeted to the forum state specifically, typically do not reach the level of constitutionally sufficient minimum contacts. *See, e.g.*, *Miller v. Szilagyi*, 221 N.C. App. 79, 92–93 (2012) (determining that plaintiff failed to demonstrate purposeful availment despite evidence that the defendants "made more than 100 telephone calls to Plaintiff in North Carolina"). For example, sending communications to a known resident of the forum while negotiating a contract usually does not suffice, even when the resident is in the forum when he receives the communications, absent a more "substantial connection" with the state. *Contrast Tom Togs, Inc. v. Ben Elias Indus. Corp.*, 318 N.C. 361, 367 (1986) (defendant "purposefully availed itself of the protection and benefits of our laws" by offering to pay the plaintiff, which it "knew to be located in North Carolina," to manufacture shirts in North Carolina), *and Shively v. ACI Holdings,* LLC, 2025 NCBC LEXIS 112, *27–28 (N.C. Super. Ct. Aug. 27, 2025) (jurisdiction existed where defendant willingly

instigated and entered into an agreement with a North Carolina company when the defendant knew it would be performed within North Carolina), *with Consulting Eng'rs Corp. v. Geometric Ltd.*, 561 F.3d 273, 276, 279–82 (4th Cir. 2009) (no jurisdiction despite communications with resident of forum where alleged wrongful conduct took place elsewhere and contract would have been performed elsewhere).

57.    Brooks's unilateral references to the "Trustee" or Robinson do not demonstrate that the Robinson Defendants authorized Brooks to act on their behalf or that Brooks acted subject to their control as an agent for purposes of serving as an agent of the Robinson Defendants. Neither the complaint nor the evidence of record demonstrates the Robinson Defendants' authorization or control of Brooks. Thus, even if the statements permit an *inference* that Brooks was acting as an agent of the Robinson Defendants, the Court determines that the complaint and the record do not demonstrate agency for purposes of Brooks's contacts and communications with Drue and otherwise with others in North Carolina.

58.    Robinson, as a corporate representative, authorized Brooks to negotiate a resolution of Drue's purported debt to Winthrop. Though a draft document bearing Drue's signature and submitted by Plaintiffs purports to be one setting out the terms of an $85,000 advance, the attached signature page bears only Drue's signature, and it appears the other party was expected to be Winthrop—precisely the entity on whose behalf Robinson acknowledges he authorized Brooks to act. (ECF No. 51.8).

59.    But neither the complaint nor the evidence of record indicates that Drue or the Robinson Defendants concluded a contract with a significant connection to North

Carolina, that the Robinson Defendants made Drue an offer to enter such a contract, or that the Robinson Defendants negotiated with Drue or physically entered North Carolina to discuss the underlying dispute.

60. Plaintiffs further contend that Brooks committed intentional infliction of emotional distress with his communications and that this is a viable basis for personal jurisdiction. (Am. Compl. ¶¶ 152–60).

61. Intentional tortious conduct originating outside a forum state can at times provide a basis for personal jurisdiction when the tortfeasor directs his conduct into the state or to an individual known to be in the state. *See Calder v. Jones*, 465 U.S. 783, 788–90 (1984) (determining jurisdiction was proper in California where defendants' "intentional, and allegedly tortious, actions were expressly aimed at California" when defendants allegedly defamed the plaintiff in an article "drawn from California sources" that "concerned the California activities of a California resident," and they knew that harm would result to the plaintiff in California); *Brown v. Ellis*, 363 N.C. 360, 361–64 (2009) (determining that personal jurisdiction existed for alienation of affection and criminal conversation claims where defendant initiated telephone and email conversations with the plaintiff's wife, who resided in North Carolina, "on an almost daily basis").

62. But Plaintiffs accuse only Brooks—not the Robinson Defendants—of tortious conduct. (*See generally* Am. Compl. ¶¶ 152–60). Even if the allegations were construed to be against the Robinson Defendants by virtue of Brooks's alleged agency, for the same reasons set forth above, the agency argument fails.

63. Plaintiffs also point to the fact that, months after he authorized Brooks to negotiate with Drue on behalf of Winthrop, Robinson signed documents on ODFS's behalf that purported to transfer ownership of Redwood RE I and II from the Redwood NWM Trust to Winthrop—i.e., purporting to transfer control over real estate in North Carolina from the Moore family to Winthrop. (Am. Compl. ¶ 68; ECF No. 51.5, ¶ 20; ECF No. 51 at 8); *see, e.g., Chadbourn, Inc. v. Katz*, 285 N.C. 700, 706–07 (1974) ("The record shows that defendant Katz entered into a contract to purchase real property situated in North Carolina, formed a corporation in this State to receive the title, and thus invoked the benefits and protection of its laws.").

64. However, Plaintiffs and the Robinson Defendants agree that the Redwood NWM Trust did not exist, that Robinson and ODFS lacked the authority to transfer ownership of Redwood RE I and II, and that the transfer did not take place. (*See* Am. Compl. ¶¶ 68–71; ECF No. 51.5, ¶ 17; ECF No. 51.2, ¶ 8 & Ex. B). The Robinson Defendants did not subject themselves to jurisdiction in North Carolina merely by attempting—and apparently failing—to transfer ownership of two Wyoming LLCs that, in turn, happen to own a house in Durham, North Carolina.

65. Finally, Plaintiffs highlight Robinson's email directly to Kelly Moore after Drue's death in which he noted that Drue "embezzled over $5 million from Winthrop" and "was not cooperating fully" with repayment efforts. (ECF No. 51.2, ¶ 13 & Ex. E). While Plaintiffs disagree with Robinson's statements, there is no suggestion that the email was tortious, nor is there any apparent reason that a single email

communicating about or summarizing an underlying dispute would constitute purposeful availment.

66. Accordingly, the Court determines that, regardless of whether considered on Plaintiff's initial burden of establishing a *prima facie* showing of jurisdiction or based on the weight and sufficiency of the evidence in light of the affidavits in the record, it is appropriate to grant the Robinson Defendants' motion to dismiss.

### III. ORDER

67. Therefore, the Court **GRANTS** the Robinson Defendants' Rule 12(b)(2) motion to dismiss and **DISMISSES WITHOUT PREJUDICE** all claims asserted against the Robinson Defendants in this action. This dismissal is without prejudice to Plaintiffs' ability to assert their claims in an appropriate forum.

**SO ORDERED**, this 7th day of November 2025.

/s/ Matthew T. Houston

Matthew T. Houston
Special Superior Court Judge
 for Complex Business Cases